1, 2, 8, 6, CCS Technologies versus. 1, 2, 8, 6, CCS Technologies versus. Thank you, Chief Judge Probst, and may it please the court, John O'Quinn on behalf of Corning. Mr. O'Quinn, both sides, I just want to know, I would agree independent three, independent claim three of the 600 pen is illicit or due? Yes. Okay. I assume you're opposing counsel on that. Yes. It's illustrative, and there are only two claims at issue with the 600 pen, claim three, claim four. Claim four has the further requirement, not just that some of the colors of the fibers remain the same, but that all of the colors of the fibers remain the same. And the board's overbroad construction of the term optical interconnection module renders that term devoid of sensible meaning, because under the board's construction, any device that has an optical fiber cable plugged into it somewhere would be treated as an optical interconnection module. That defies common sense, and it is divorced from the description of optical interconnection modules found in the specification, as well as the meaning found in the technical dictionary used in this field, as well as the very purpose of the patent intervention, which is to make it... Help me understand what's going on here. As I understand it, there's a limitation on the length of a fiber optic cable, and that as a result of that, you have modules which would connect two strands of cable together, right? That's right. Principally right, Judge Steig. The purpose of having a module can vary from system to system. Sometimes it is to break out the fibers into individual fibers. Sometimes, as here, it's to do pairwise flipping. But yes, you have a module that serves where the module itself is doing the optical interconnecting between systems. Okay, but you also could have a module that all fiber optic needs to be connected to an electrical device, such as a computer, right? You could have one module next to one computer, and then a fiber optic connection to another module, which is electrically connected to another computer, right? Well, you could have a module. If you're going to have an optical interconnection module, then the module itself needs to be optically interconnecting systems. Now, it may be that there are other types of modules. If you have the optical connection between the two modules, that could be one module could be in New York, one could be in Washington, and at the end of the day, each module connects to a computer, has an electrical connection to the computer. So the module can serve that function too, right? Well, Judge Steig, respectfully, no. Not in being an optical interconnection module, and indeed, if you look, for example, at a But in terms of the technology, you know, that could be function of the module connecting to an electrical device, right? So you have the optical cable coming in to the module, and then it connects at the other end to the electrical device. Well, Judge Steig, if it is using... Is that true? Not for an optical interconnection module, if I'm understanding your question correctly. You might have, for example, an electro-optical interconnection module, which is exactly what's described in Eichenberger. It sounds like terminology. Yeah, but it seems like terminology. The question is whether these claims described encompass both of those. That is a module that's used to connect an electrical device, and a module that's used to connect one optical cable to another optical cable. Well, I think the claims here, Judge Steig, are using the term optical interconnection module in its plain sense, the same sense that's found in the only dictionary at issue in this case, the fiber-optic standard dictionary, which describes it as a housing that holds fiber-optic splices, fiber-optic connectors, and fiber-optic couplers used to distribute signals on incoming fiber-optic cables to outgoing fiber-optic cables by means of connectors. And indeed, every single example that you find in the specification, every picture, every description, is one that is consistently using modules that are connecting optical ribbons and optical fiber connectors by an optical path. Now, I agree. At the end of a system, you have to have something other than optical interconnection modules in order to be able to do an optical-to-electrical transition. And that is what Eichenberger is disclosing. But as the testimony from our expert, for example, at Appendix 628, Mr. Pearson explains, optical interconnection modules are modules that are going to be found in the middle of a network. And the whole point of this invention is to maintain polarity. That is to... Well, that's the question as to whether it means a module in the middle of a network to connect to fiber-optic cables or whether it also encompasses Eichenberger's optical connection to an electrical device. Well, I agree. That is the question. And it really boils down to the board's overbroad claim construction. And I say it's overbroad because under the board's construction, any device that has an optical fiber plugged into it is going to meet the definition of optical fiber cable because... Excuse me, of optical interconnecting module. And the reason for that is that the board essentially treats the module as just having to have some optical interconnection somewhere within it. And our point, our consistent point from institution and in our patented response is that it's the module itself that has to do the optical interconnecting. It's not enough that there is one or even several optical interconnections inside the module. It is that the module itself has to do the optical interconnecting. And I realize analogies... I'm not sure what that means. Let me offer an analogy, and I realize analogies can be dangerous, but let me just try one. Imagine what you might think of as an electrical interconnection module. What would be a classic electrical interconnection module? A power strip, right? You have the plug on one end in order to go into the wall socket or into an extension cord or whatever. You then have the strip itself that distributes electricity to different outlets, and those things themselves can then have an electrical connection put to it. That would be an electrical interconnection module. But to take the analogy one step further, the way the board's done its construction here is it would say any device that has an electrical connection, in our case it's optical but from a hypothetical electrical, would be an electrical interconnection device. So a television, a toaster, would meet the definition of electrical interconnection module under my hypothetical if you use the board's approach. I don't think that's true. I understand the board to be saying that the two modules have to be connected optically and at the other end they can be connected to something electrically. Well what the board is saying, and I think if you look at Appendix 19, the board says, quote, Eichenberger describes fibers with an optical head 40 optically interconnecting to fibers from the ribbon. Therefore, Eichenberger teaches a module that forms an optical interconnection, end quote. So what it's saying is that you take Eichenberger module 10, which has the connector 40, and when you plug the optical ribbon into 40, that's making an optical interconnection and that's what makes module 10 of Eichenberger, according to the board, an optical interconnection module. And that would be true whether it was plugged into a transceiver, which is what Eichenberger is, or if it was plugged into a cable box, or if it was plugged into anything. And that's what makes the definition here fundamentally overbroad. And again, they have no answer, Panduit has no answer to the standard dictionary definition other than to say, oh well it's a dictionary and it's extrinsic. Well Phillips doesn't say that you can't consider dictionary definitions and there is nothing in the specification that's... Well, okay, I wanted to get to the specification because what, I mean, the board did cite the specification, I think, extensively in the figures and so forth. And you've so far talked about a dictionary and talked about, I think, some of expert testimony. So where in the specification do you go to support your construction? It seems to me we're just line drawing here about what is actually a module, right? Well, what is an optical interconnection module? And I don't mean to quibble, it's just that the modifier optical interconnection goes to what the module is doing, what the module is. And I would say every single example, if you look at the abstract, which is on Appendix 61, if you look at Column 1, Line 65, to Column 2, Line 20, which is in the summary of the invention, which you find on Appendix 65, every single example, and there are multiple examples in the detailed description as well, like on Column 3, Lines 32 to 35, every single example describes modules that are connecting optical ribbons on one end and optical fiber connectors on the other. And the only thing that they say in response is, oh, well, those optical fiber connectors don't actually have, in the illustrations, a fiber plugged into them. And that's because the term optical interconnection module is just being used in its plain, ordinary sense. You don't need to show that it's being, that the fibers are actually plugged in. You know, if it's sitting on a shelf and there are no fibers that are plugged into it, it's still an optical interconnection module. Every single example has optical fiber connectors on one end and the connector for the optical ribbon on the other, which means it's an optical ribbon coming in on one end and it is optical fibers going out on the other. Using your toaster analogy, which is pernicious. Always dangerous. I'm just sitting here thinking about an optical toaster. The PTAB construed optical interconnection module to require, quote, an optical interconnection within the module. Right. So it's not just going in, it requires a connection within the module of some sort. I agree with that, Judge Wallach. And so maybe the toaster analogy doesn't work. Maybe the better analogy is the television where you've got to put the plug into the back of the television. But I think that is exactly the same as putting the optical fiber plug into connector 40 of module 10 of Eichenberger. I'm happy to continue answering questions or I'm happy to reserve the balance of my time. We'll hear from the other side. Thank you. Thank you, Chief Judge Prost. I assume you agree, too, that independent three, claim three is illustrious. We do, Your Honor. Good morning, Your Honors. May it please the court. I just wanted to, there's a lot to unpack here, so maybe we can just start with the constructions and why we disagree. So I think what counsel is overlooking is that the board's construction was in two parts. It requires an optical connection within the module. That's the first part. That's at A10. But it also, of course, requires an optical interconnection, and that's A10 to A11. That's the part that I believe Corning is overlooking here is that it does require that optical interconnection. And, in fact, this two-part construction relied heavily upon what Corning argued in its patent owner preliminary response. It didn't come up with this out of the blue. It actually was parsing language from their own construction. And, in fact, the board goes, if we could just look at the claims, the plain language of the claims requires an optical interconnection module. So right there we have to have an optical interconnection. That's what the board said. Look at the claims. And then we can look at the spec. And it lines 49 through 51 in column 2. The specification says the module 60 also includes an optical interconnection section having an optical connector. And then if we go a little further down, 57 to 60 in column 2, it teaches that the optical interconnection section, optically interconnects with fibers in ribbon 20. So that's the first part of the construction that Corning has omitted in his briefs and in his discussion now. The second part of that is that the optical connection within the module part, if you look at the specification, figure 2, for example, and column 3 lines 20 through 24, that reinforces that concept. But here's the important part to understand. Claim 3 is very different from claim 1. Claim 3 has to do with optical assemblies. And what claim 3 is concerned about is the maintaining polarity, the wiring between the first module and the second module on opposite ends. That's a crucial distinction. That is the purpose of the invention. There's a lot of discussion about the purpose of the invention, which I'll get to. But that is the purpose, is maintaining polarity. And, in fact, that's exactly what we saw in Eichenberger. In fact, both parties seem to agree on that particular point, that both Eichenberger and the patent in claim 3 is concerned about maintaining polarity. That's why Eichenberger is so on point here. Let's talk a little bit about their construction. Optical interconnection module must connect an incoming optical fiber to an outcoming optical fiber. Here's the problem with that.  If you look at the plain claim language, there's nothing about outgoing fibers. If you look at the figures in the specification, there's no discussion about outgoing fibers. In fact, that's what compelled them in their briefing before the board to add in optical fibers coming out of the modules, both below and even in the brief here. They were amending those figures to include those optical fibers outgoing. There's no trace of that in the figures in the patent. There's actually no discussion about outgoing fibers, period. Why would you maintain polarity if it wasn't outgoing? They're saying that it has to be an outgoing optical fiber connection. The claim is agnostic to that. Claim 3 doesn't discuss that, and Judge Dyke, you picked up on this exactly. Ultimately, there is some sort of electrical device. It could be a computer server, computers. Remember, this is in a LAN environment. Does that answer my question? Yes. Why would you have to maintain polarity of the incoming device if there's no outgoing optical? There's something outgoing. These don't exist in a vacuum. What they're arguing is that it has to be outgoing optical fibers. In other words, these two modules with the stuff in the middle, they can be connected to all sorts of things. It just doesn't have to be outgoing optical fibers that they're connected to. They can be connected to a variety of different things. As Judge Dyke pointed out, they could be electrical in nature. They could be optoelectronic in nature. They could be fiberoptic in nature. The claims just aren't limited in the way they want them to be limited. That's how they're trying to get around Eichenberger. That's why they changed their construction in their patent owner preliminary response to the patent owner response because of that issue. The claims just aren't limited like that. With respect to their extrinsic evidence, that's just a bit of a red herring because that extrinsic evidence is in tension with what the patent actually discloses in the claim claim. Because remember, in Claim 3, we're focusing on what's going on between the modules. We're not focusing on what's external beyond those modules outside of the optical assembly. So that's a crucial distinction that I want the court to take home with them. Assume you're talking to someone who learned everything, couldn't know he's got electricity from plugging that hero pin into a light socket when he was three years old. Yes. Why would you have to maintain polarity as to outgoing electrical devices? Well, Eichenberger is a great example of that. In Eichenberger, what you have are transmitter diodes and receiver diodes. So you have to be sure that the transceiver... So with respect to that purpose, I just want to reinforce the fact that Eichenberger's concern is maintaining polarity between the modules inside the assembly. The concern is not external. That external concern, claims are agnostic to that. And that's a big distinction from Claim 1 where you're really focusing very directly on what's going on inside the module and the structure in that module. So to summarize, Your Honors, we need to focus on the claims that issued, not the claims that Corning wishes had issued. The intrinsic evidence is devoid of any support for requiring the optical interconnection modules to connect to any incoming fibers to outgoing fibers. That's just not what the claims require. That is why Corning felt compelled to repeatedly alter those figures in its briefing to contain fibers extending from the modules that just don't exist in the patent. By contrast, the spec and the claims fully support the Board's construction of this limitation. Lastly, I think it should be emphasized that, as a factual matter, Corning has conceded that Eichenberger does indeed disclose an optical interconnection. And this is what Corning stated. To be sure, there is an optical interconnection at the point where the fibers of the optical head body 40 are connected to the separate fibers of connector 64. And I direct the Court's attention to A316. So no matter how Corning twists and turns the language of the claims, at the end of the day they've conceded that there is an optical interconnection disclosed by Eichenberger. And if the Court doesn't have any further questions. Thank you. Thank you. Judge Wallach, I think the question that you were asking is exactly the right question here. Because there is no purpose to maintaining polarity in something like Eichenberger. Because what is coming out of Eichenberger are not optical signals. What's coming out of Eichenberger are electrical signals. But you still have to maintain polarity, do you not? In dealing with, for example, the diodes that were discussed by your opposing counsel. So inside Eichenberger, yes, there are fiber optic cables or optical fibers that are connected to the various diodes. One for transmitting, one for receiving. But in terms of what is coming out of Eichenberger itself, you have the optical signals coming out on one end. You have the electrical signals coming out on the other. That's what makes it not an optical interconnection module. It is an electro-optical interconnection. I don't dispute that it's interconnecting something. What it is interconnecting are electrical signals and optical signals. In order to be an optical interconnection module, it needs to be interconnecting optical signals. Because the entire purpose, if you look at column 3, lines 32 to 35, the entire purpose is that you can use the modules of the present inventions. This is at Appendix 66. You can use the modules of the present inventions. Interconnection of assemblies are deployable in a network. Multiple spans of assemblies can be interconnected, and the optical path remains with its color. The whole point of this is that you have these assemblies that can be deployed throughout a network, and the colors, the polarity will be maintained from one to the other. There's nothing special about having the ribbon run between two modules. What's special is being able to have series of these where the color remains the same, where the polarity remains the same. That's the entire purpose of the invention. Of course, as this court held in TQ Delta versus DISH Network 929F3 at 1358, when the specification indicates the purpose of the invention, that is good evidence for how the claims ought to be interpreted. Fundamentally, they have no answer to the fact that the only technical dictionary definition at issue here makes it clear that you've got to have the incoming and the outgoing fiber optics. Or the capability for it. Again, if you have the device sitting on a shelf, it's still an optical interconnection module. Other than to say, well, that's somehow inconsistent with the specification. Show me the inconsistency. There's no inconsistency whatsoever, because every single example, including those at column 3, 32 to 35, and those at column 23, 52 to 55, and every single figure, figure 2, 3, and 4, every single one show that the module itself is used for optically interconnecting optical ribbon on one end and optical fibers on the other. That's what it means for it to be an optical interconnection module. As for the point that my colleague made at the very end regarding 40 and 64, that was not a basis for the board's institution. It's not a basis for the board's decision. This is, of course, APA review, and there's no basis for relying on that at this point, in addition to the analysis of that being flawed. I'm happy to answer any further questions the panel may have. Thank you. Thank you, Chief Judge Post. Thank both sides. The case is submitted.